Not for Publication

United States District Court
for the District of New Jersey

| | |
|---|---|
| RENE RASMUSSEN, an individual,<br><br>        *Plaintiff*,<br> v.<br><br>UNITED STATES OF AMERICA,<br><br>        *Defendant*. | Civil No: 14-6726 (KSH)(CLW)<br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

**I. INTRODUCTION**

  Plaintiff Rene Rasmussen ("Rasmussen") seeks special, general, and punitive damages from the United State of America, under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), on claims of false arrest, malicious prosecution, false imprisonment, wrongful search and seizure of property and communications, and intentional infliction of emotional distress.

**II. FACTUAL AND PROCEDURAL HISTORY**

  On June 21, 2012, Rasmussen was arrested on a warrant issued by United States Magistrate Judge Mark Falk, the basis of which was a duly sworn complaint, consisting of seven pages of detailed allegations against Rasmussen, made by FBI agent Gerald Cotellesse. (D.E. 9-2, Ex. A, "Cotellesse Complaint.")  The complaint alleged that Rasmussen was involved in telecommunications fraud violating the federal wire fraud statute, 18 U.S.C. § 1343.  According to the complaint, Rasmussen and three co-conspirators used stolen or fraudulent telephone numbers to generate unauthorized calls to Premium Numbers, which are telephone numbers that charge, usually by the minute, for call services such as adult entertainment, chat lines, and

1

psychic lines.  A telephone company, for example AT&T, pays the owner of the Premium Number a percentage of the premium rate charged and then collects the premium rate from the individual caller.  Out of the customer's premium rate payment the company reimburses itself for the percentage it paid to the owner of the Premium Number and takes a share for itself.

Rasmussen claims in his federal complaint (D.E. 1, "Compl." ¶ 16) that Cotellesse accused him and others of renting Premium Numbers from international companies and collecting their percentage of per-minute premium rates from the telephone companies fully aware that "the telephone companies would not recover the premium rates from the caller." (Compl. ¶ 16(a).)  This is because they used stolen telephone systems to generate unauthorized, "fake," untraceable calls to the Premium Numbers they leased.  Rasmussen and the others were able to produce these fake calls by hacking into private bank eXchange (PBX) systems (internal telephone systems commonly used by large businesses), identifying open telephone extensions, and generating calls from those extensions to their Premium Numbers.  In an attempt to avoid detection, they limited the number and length of calls per day that they made to the fraudulent Premium Numbers.  Additionally, Rasmussen and the others used Calling Line Identification (CLI), a means of identifying the person calling into the Premium Number, to determine which calls were attributable to whom so that payment for each call went to the person who originated it.  The Premium Numbers contained no actual content.  Instead, a call to one of these Premium Numbers generated fake rings, password prompts, voicemail messages, music, or dead air.

Between 2008 and April 2012, the FBI estimated that there were over 13 million minutes of these fake calls made from over 4,800 victim PBX systems, resulting in losses to the telephone companies of $30,000,000.  (Cotellesse Complaint ¶¶ 16, 17.)  "According to AT&T officials, Stolen Calls originating from Defendant RASMUSSEN's Metro PCS Phones

accounted for approximately 187,000 minutes of Stolen Calls that caused approximately $40,000 in fraud losses for the period between in or about April 2010 through in or about August 2011." (Cotellesse Complaint ¶ 28.)

According to the sworn complaint, Rasmussen sent one co-conspirator an email on May 7, 2010, stating that he would "start the traffic in 15 minute[s]," and to "please let me know how long the call must be and if you like the CLI we can hire." (Cotellesse Complaint ¶ 22.) On July 27, 2010, Rasmussen sent the same co-conspirator an email about "controlling the Chile traffic to Premium Numbers," stating, "CHILE Traffic should be spread out equally across the day[.] Calls must be between 5-11 minutes, Monday to Friday 09hrs-21:59 hrs local time[.]" (Cotellesse Complaint ¶ 23.) Cotellesse explained, based on his training and experience, that there would be no legitimate reason for Rasmussen to "dictate the times during which telephone calls would be made to Premium Numbers or the duration of the calls."[1] (Id.)

When Rasmussen was arrested on the complaint he was at John F. Kennedy International Airport in New York, returning from a family vacation. Rasmussen is a citizen of Denmark, but at that time he lived in Orlando, Florida. He was legally in the United States on an E2 Investor Visa, pursuant to which he managed three telecommunications businesses, Delta1Call, LLC, MultiTelco LLC, and Q1Call LLC. (Compl. ¶ 10.) After his arrest, Rasmussen was taken by Department of Homeland Security (DHS) agents to an interrogation room in the airport. He was then transferred to the FBI's office in Newark, New Jersey, where he was questioned about his involvement in the conspiracy to commit fraud. (Compl. ¶ 15.) Rasmussen states in his federal complaint that he did not recognize the initials of any of the alleged co-conspirators in Cotellesse's complaint, and that it falsely accused him of:

---

[1] Rasmussen does not deny, comment or attempt to explain the existence of these emails in either his federal complaint (D.E. 1) or in his opposition to the United States' motion to dismiss (D.E. 14).

1. Purchasing 30 cell phones, and hiring people to obtain and activate these phones, which were issued from Metro PCS, to generate false calls to Premium Numbers. (Compl. ¶ 19.)
2. "Using autodialing software to generate fraudulent telephone calls to Premium Numbers." (Compl. ¶ 20.)
3. Using or conspiring "to use hacked PBX systems, the Metro PCS Phones, or other phones to originate unauthorized telephone call (sic) to Fraudulent Premium Numbers." (Compl. ¶ 21.)
4. Sharing "Calling Line Identification" with several co-conspirators so they "could determine the number of the stolen calls to Fraudulent Premium Numbers attributable to Mr. Rasmussen and the amount that he should be paid for originating those calls." (Compl. ¶ 22.)
5. Receiving "access to any websites that allowed Mr. Rasmussen to track the numbers of the stolen calls" from the co-defendants. (Compl. ¶ 23.)
6. Conspiring to place "187,000 minutes (sic) worth of false telephone calls to AT&T that caused approximately $40,000 in loses (sic) to that company." (Compl. ¶ 24.)

He asserts that Cotellesse "knowingly and/or recklessly" made "false and/or misleading statements" in his complaint. (Compl. ¶¶ 38, 40.) Rasmussen does not allege that Judge Falk failed in making a probable cause determination based on that complaint or that there was police misconduct during or following his arrest.

Rasmussen was detained for seven weeks before posting bail on August 10, 2012. (Compl. ¶ 28.) He was then taken into custody by Immigration and Customs Enforcement on a detainer it had lodged based on the pending criminal charges. (Id.) Two days later he was released and placed on house arrest. On March 7, 2013 the United States Attorney for the District of New Jersey dismissed without prejudice all charges against Rasmussen. On May 20, 2013, Rasmussen was contacted by DHS and informed that his E-2 Investor Visa had been cancelled, and that he and his family had ten days to leave the country. (Compl. ¶¶ 33, 35.) He claims that because of his detention, house arrest, and the limited time he was permitted to

4

remain in the United States, he lost his business investments and $10-$15 million in expected profits. (Compl. ¶ 35.)

In 2014, Rasmussen timely filed notice of his claims against the United States with the Department of Justice and FBI, pursuant to the notice requirements of the Federal Tort Claims Act (FTCA). (Compl.¶ 6.) The Department of Justice administratively denied his claim on July 11, 2014. (Id.) Rasmussen, his wife, and their 12 year old son, filed a joint complaint under the FTCA (D.E. 1) on October 28, 2014. On December 3, 2014, the parties stipulated that the United States was the only properly named defendant. (D.E. 7.) Thereafter, on March 3, 2015, the plaintiffs stipulated to dismiss with prejudice the claims filed by Sylvestre and Rasmussen's son. (D.E. 13.) There remain Rasmussen's six claims brought alleging (1) false arrest, (2) malicious prosecution, (3) false imprisonment, (4) wrongful searches and seizures of property and communications, (5) abuse of process and (6) intentional infliction of emotional distress, pursuant to the FTCA, 28 U.S.C. § 1346(b) and § 2680(h). (Compl. ¶ 37.)

The United States moves to dismiss, arguing that under Federal Rule of Civil Procedure 12(b)(1) the FTCA lacks subject matter jurisdiction over the claim for wrongful search and seizure. The United States argues that the remaining claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because Rasmussen fails to state claims upon which relief can be granted.

### III.   APPLICABLE LEGAL STANDARD AND GOVERNING LAW

#### A. Jurisdiction

The FTCA, 28 U.S.C. § 1346(b), provides for a limited waiver of sovereign immunity on claims against the United States for "money damages…for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the

Government while acting within the scope of his office or employment." The United States is liable in a like manner to private individuals being sued under the same circumstances. 28 U.S.C. § 2674 (stating that "the United States should be liable…relating to tort claims, in the same manner and same extent as a private individual"). A plaintiff must file an FTCA claim "where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402.

The broad waiver of sovereign immunity provided by 28 U.S.C. § 1346(b) was narrowed by 28 U.S.C. § 2680(h) which exempted intentional torts. Then, in 1974, Congress amended that exemption, and the FTCA now waives immunity "with regard to acts or omissions of law enforcement officers of the United States government" for certain specified intentional torts "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, and abuse of process." § 2680(h); *see also* "Statutory Exceptions to Sovereign Immunity," 14 Fed. Prac. & Proc. Juris. § 3658.2 (4th ed.). A law enforcement officer, under 28 U.S.C. § 2680(h), is one "empowered by law to execute searches, to seize evidence or to make arrests for violations of federal law," regardless of whether the officer was actively engaged in that conduct at the time of the alleged offense. *Millbrook*, 133 S. Ct. at 1446. Rasmussen's complaint alleges specific intentional torts committed by FBI officer Cotellesse, who is subject to suit as a "law enforcement officer."

Before a plaintiff may file an FTCA claim with the district court he must "first present [] his claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). This requirement provides administrative notice to the government agencies against which the suit is being filed. Rasmussen presented an administrative tort claim to the FBI, which was denied in

writing as confirmed by Rasmussen's complaint and Lori Lee Holland's FBI declaration. (Compl. ¶ 6; D.E. 9-3, Ex. B "Holland Statement"). The administrative notice requirement is satisfied in this case.

### B. Choice of Law

When analyzing individual tort claims under the FTCA, the court must apply the law of the state where the cause of action "accrues" to determine whether the United States is liable. *Clayton v. United States*, 913 F. Supp. 2d 80, 84 (D.N.J. 2012) (Simandle, J.) (citing *Ciccarone v. United States,* 486 F.2d 253, 257 (3d Cir. 1973) (holding "it is the substantive law of the State wherein the cause of action accrued which governs liability of the United States on claims brought under the Federal Tort Claims Act")); *see also DeJesus v. U.S. Dep't of Veterans Affairs*, 479 F.3d 271, 279 (3d Cir. 2007) (stating "the liability of the United States under the FTCA is determined by the law of the state where the allegedly tortious act occurred"). In a multistate tort action, such as this one where the arrest was in New York but the complained of actions took place in New Jersey, the FTCA requires "a federal court to apply the whole law of the place where the acts of negligence occurred, including its choice-of-law rules." *Clayton v. United States*, 913 F. Supp. 2d at 85. Since the arrest warrant was issued in New Jersey and Rasmussen was detained almost entirely in New Jersey, there is no dispute that New Jersey substantive law applies.

### C. Motion to Dismiss Standard

This case is before the court on a motion to dismiss for failing to state claims under Federal Rules of Civil Procedure 12(b)(6) and for lack of subject matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1). For a 12(b)(6) motion to be granted, after accepting all allegations in the complaint and all reasonable inferences that can be drawn therefrom, the

court must determine that the plaintiff is not entitled to relief based on the claim presented. To avoid that fate, the plaintiff must "plead more than the possibility of relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The claim need not provide all details of the alleged offense, but "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 663, 680-81 (2009) (requiring more than a "formulaic recitation of the elements' of a constitutional discrimination claim").

## IV. LEGAL ANALYSIS

### A. False Arrest (False Imprisonment)

As a preliminary matter, "false arrest and false imprisonment are not separate torts; they are different names for the same tort." *Price v. Phillips*, 90 N.J. Super. 480, 484, 218 A.2d 167, 169 (App. Div. 1966) (citing Prosser on Torts (3d ed. 1964)). As they are one in the same offense, most commonly referred to as false arrest, this court dismisses Rasmussen's false imprisonment claim and examines his allegations as a false arrest claim.

In New Jersey, the tort of false arrest requires "an arrest or detention of the person against his or her will; and lack of proper legal authority or 'legal justification.'" *Mesgleski v. Oraboni*, 330 N.J. Super. 10, 24 (App. Div. 2000) (citing *Barletta v. Golden Nugget Hotel Casino*, 580 F. Supp. 614, 617 (D.N.J. 1984)). For the arrest to be without proper legal authority or justification, it must be done either without a valid warrant or an identified exception to the warrant requirement. *See Payton v. New York,* 445 U.S. 573, 586 (1980). "The warrant requirement safeguards citizens by placing the determination of probable cause in the hands of a neutral magistrate." *State v. Penalber*, 386 N.J. Super. 1, 8 (App. Div. 2006) (citing *See Payton v. New York,* 445 U.S. 573, 586 (1980)); *see also State v. Ruotolo*, 52 N.J. 508, 515 (1968)

(holding that for misdemeanors a clerk or deputy of a municipal court "possess the neutral status and qualifications" to issue an arrest warrant). A magistrate's decision to issue a warrant, especially one valid on its face, should be afforded substantial deference. *State v. Dispoto*, 383 N.J. Super. 205, 216 (App. Div. 2006) *aff'd as modified*, 189 N.J. 108 (2007).

Even with its favored status, the existence of an arrest warrant alone does not automatically foreclose the possibility of a false arrest. *See id*. In this case, Rasmussen was arrested on the basis of warrant issued by Magistrate Judge Mark Falk on May 22, 2012. (D.E. 9-2, Ex. A, "Warrant for Arrest.") Rasmussen does not allege that the warrant was not authorized by a neutral magistrate. Nor does he contend that the warrant was executed in an unlawful manner. Instead, he asserts that Cotellesse's complaint, which was the basis for the arrest warrant, contained "false and/or misleading statements" made "knowingly and/or recklessly," and that Cotellesee's conduct was "intentional." (Compl. ¶¶ 38, 40.) For the arrest warrant to be invalid and as such a basis for Rasmussen's false arrest claim, Cotellesse's statements would have to be false, made "knowingly and intentionally, or with reckless disregard for the truth," and also would have to be "necessary for the finding of probable cause." *Frank v. Delaware,* 438 U.S. 154, 155-56 (1978).

But Rasmussen's assertions that Cotellesse either intentionally or negligently provided false information in the complaint are threadbare. He presents no facts which support this assertion, provides no motive for such conduct, and offers only legal conclusions. ("[A]t no point did the FBI or its investigating agents ever possess probable cause that defendant committed telecommunications fraud as described in the complaint." (Compl. ¶ 31.)) Such conclusory and speculative assertions do not satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a)(2) as required by *Iqbal* and *Twombly*.

9

Significantly, putting aside the six assertions that Rasmussen specifically denies are true, Cotellesse's sworn statements provide sufficient, unchallenged information for Judge Falk to have reasonably found probable cause to issue the arrest warrant.  "For probable cause to arrest, there must be probable cause to believe that a crime has been committed and 'that the person sought to be arrested committed the offense.'"  *State v. Chippero*, 201 N.J. 14, 28 (2009) (quoting *Schneider v. Simonini*, 163 N.J. 336, 363 (2000)).  Rasmussen, it bears noting, does not challenge the description in the sworn complaint of the fraud scheme or the methods and means by which the conspirators bilked the telephone companies.  Based on that material Judge Falk could reasonably have found probable cause that Rasmussen was criminally involved from Rasmussen's emails stating that he would "start the traffic in 15 minute[s]" and that "CHILE Traffic should be spread out equally across the day[.]  Calls must be between 5-11 minutes, Monday to Friday 09hrs-21:59 hrs local time"; and Cotellesse's statements that in his training and experience, there is no legitimate reason for Rasmussen to "dictate the times during which telephone calls would be made to Premium Numbers or the duration of the calls." (Cotellesse Complaint ¶¶ 22-23.)

"When the affiant falsely and maliciously states facts untruly and procures a warrant" based on false statements, malice and want of probable cause can be inferred.  *Earl v. Winne*, 14 N.J. 119, 133 (1953).  Extracting malice using only the face of the complaint, then, necessarily requires a showing that the affidavit presented was false.  More recently, the New Jersey Supreme Court expanded on this premise that malice can be inferred from a lack of probable cause. In *LoBiondo v. Schwartz*, 199 N.J. 62, 94-95 (2009), the court explained that "it is not necessarily true that legal malice will be established by a lack of probable cause."  Instead, "the less evidence of probable cause there is, the more likely it is that the original plaintiff was

10

motivated by an impermissible, malicious intent." A sufficient showing of either probable cause or reasonable belief that the facts established probable cause can defeat any malice requirement. *Id.* Rasmussen fails to plead facts that plausibly support the falsity of the entire affidavit, which is what *Earl* and its modest line of cases appear to require.

Rasmussen also relies on *Cashen v. Spann,* 66 N.J. 541 (1975) for the proposition that "[m]alice and want of probable cause are thus inferred from the falsity of the affidavit upon which the arrest was procured." *See also Navarino v. Dudrap*, 66 N.J.L. 620, 50 A. 353 (E. & A.1901). In *Cashen*, detectives, armed with a search warrant, made a "horrendous mistake" when they broke into the house of an elderly couple looking for evidence of gambling; the couple had no relationship to any of the illegal activity alleged in the affidavit upon which the search warrant was signed. *Cashen v. Spann*, 125 N.J. Super. 386, 392-93 (App. Div. 1973) *aff'd in part, modified in part and remanded,* 66 N.J. 541 (1975). While the bulk of the *Cashen* opinions focused on issues of immunity, the court denied the defendants' motion for summary judgment because the plaintiffs had raised issues of material fact as to whether the information provided in the affidavit was given in good faith or maliciously. *Id.* at 402-03. Arising out of a "horrendous mistake" as it does, *Cashen* fails to be instructive other than to demonstrate that courts will evaluate the existence of probable cause based on how much of the presenting information for the warrant is true (which makes sense). It does not stand for the proposition that Rasmussen's selective, unsupported attacks on the complaint here give rise to liability.

Rasmussen fails to plausibly assert that the accusations in the criminal complaint were intentionally, knowingly, recklessly false and his claims as to false arrest are dismissed.

    **B.**    **Malicious Prosecution**

11

To successfully bring a suit for malicious prosecution in New Jersey, a plaintiff must show: "(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." *Helmy v. City of Jersey City*, 178 N.J. 183, 190 (2003). In essence, the proceeding must have been "instituted without reason or probable cause." *Shoemaker v. Shoemaker*, 11 N.J. Super. 471, 474 (App. Div. 1951).

The plaintiff must establish *each* of these elements for the cause of action to survive. *Brunson v. Affinity Federal Credit Union,* 199 N.J. 381, 394 (2009). It is undisputed that a criminal proceeding was initiated against Rasmussen, so the first element of the malicious prosecution charge is satisfied. But Rasmussen has failed to plead facts establishing that the warrant for his arrest was issued without probable cause, failing to satisfy the third element. Rasmussen argues that the requirement of malice "may be inferred from want of probable cause." *Brunson*, 119 N.J. at 395. But with probable cause found, and no additional facts asserted to support malice, there is no showing on the second element of malicious prosecution.

Both parties discuss at length whether the prosecution was favorably terminated. As Rasmussen fails to satisfy two of the other required elements to bring a claim for malicious prosecution, the Court finds it unnecessary to comment on the parties' positions. The court does note that in New Jersey the issue of whether a termination is favorable focuses on "whether the termination was or was not dispositive as to the accused's innocence of the crime." *Fleming v. United Parcel Service, Inc.,* 255 N.J. Super. 108, 150 (Law Div. 1992) (quoting *Rubin v. Nowak,* 248 N.J. Super. 80, 83 (App. Div. 1991)).

Here, the United States Attorney dismissed charges against Rasmussen, which can be viewed as formal abandonment and as a consequence, arguably, a favorable termination of the

proceedings. *See e.g. Rubin v. Nowak*, 248 N.J. Super 80, 83-84 (App. Div. 1991) (holding that formal abandonment of the proceedings by the public prosecutor is a favorable termination unless abandonment was as a result of "agreement of compromise," "misconduct on the part of the accused or on in his behalf for the purpose of preventing proper trial" and "without new proceedings pending for the same case"). Were there relevance to deciding the issue, the Court notes the absence of information about the reasons for the dismissal. In any event, the problem still remains that Rasmussen fails to satisfy two required elements of malicious prosecution. As such, his claim for malicious prosecution is dismissed.

### C. Abuse of Process

New Jersey courts recognize the tort of abuse of process and follow the Restatement formulation: "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1037 (3d Cir. 1988) (citing *Restatement (Second) of Torts* § 682 (1977)). "A showing of some coercive or illegitimate use of the judicial process is necessary to a claim that there has been an abuse of the process." *Id.* (citing *Penwag Prop. Co. v. Landau,* 148 N.J. Super. 493, 499 (App. Div. 1977)). "[T]he essential elements are an ulterior motive and some further act after the issuance of process representing the perversion of the legitimate use of the process." *Fielder Agency v. Eldan Constr. Corp.,* 152 N.J. Super. 344, 348 (Ch. Div. 1977).

Rasmussen brings a claim for abuse of process "based upon false and misleading affidavits." Rasmussen explains in his opposition to the government's motion to dismiss that:

> in initiating, ordering, directing, authorizing, conspiring to effect and/or actively and substantially participating in his false arrest, malicious prosecution and unlawful detention, without probable cause, it can be inferred that SA Cotellesse could not have

13

>  possessed a reasonable belief of Plaintiff's guilt and had some ulterior motive in prosecuting Plaintiff . . . Plaintiff also alleges that the continual prosecution for nearly nine months constitutes further acts after an issuance of process.

The viability of the abuse of process claim as described in Rasmussen's own words rests on the lack of probable cause. Again, the Court is satisfied that the complaint presented enough information to establish probable cause to issue the arrest warrant. Rasmussen offers no plausible facts establishing an ulterior motive. Rasmussen demonstrates the paucity of his pleading when he suggests the Court should "infer[] that SA Cotellesse could not have possessed a reasonable belief of Plaintiff's guilt and had some ulterior motive in prosecuting Plaintiff . . . ." His argument that the "continual prosecution" for nine months constituted "further acts" actionable under the FTCA simply makes no sense. Accordingly, Rasmussen's abuse of process claim fails and is dismissed.

### D. Intentional Infliction of Emotional Distress

While the United States' sovereign immunity was not traditionally waived for intentional infliction of emotion distress claims, modern courts have often found these claims sufficiently distinguishable from the exceptions in 28 U.S.C. § 2680(h) to permit them to be brought under the FTCA. *See e.g. Alvarez-Machain v. United States*, 331 F.3d 604, 541 (9th Cir. 2003); *see also Limone v. United States,* 579 F.3d 79 (1st Cir. 2009). "[T]o establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988). The defendant's conduct must be "extreme and outrageous," that is, "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.*

(quoting *Restatement, supra,* § 46 comment d).  The totality of the conduct which Rasmussen pleads is that:

> Cotellesse intentionally made numerous false accusations against him in a criminal complaint which described him running a complex criminal scheme, that SA Cotellesse caused Plaintiff to be arrested and incarcerated for a period of nearly two months, and that the accusation destroyed his reputation as a business owner and entrepreneur as the falsehoods were made in public.

(D.E. 14, "Rasmussen's Opposition Brief," p.20).  Even had Rasmussen offered some factual support for his sweeping charges, case law shows that as a practical matter, he would still not have met the high standard required.  *See, e.g.*, *Brown v. City of New York,* 306 F. Supp. 2d 473, 481 (S.D. N.Y. 2004) (denying claim for intentional infliction of emotional distress when police mistakenly arrested and prosecuted plaintiff for homicide); *see also Ramirez v. United States*, 998 F. Supp. 425, 434 (D.N.J. 1998) (Walls, J.) (holding that, as a matter of law, INS conduct did not rise to the level of extreme or outrageous where the plaintiff was detained but was not "beaten, held under unbearable conditions, or otherwise severely mistreated").  And again, as discussed, the attacks on the sworn complaint fail under New Jersey law, which defeats Rasmussen's charge of intentional infliction of emotional distress.

### E.    Wrongful Searches and Seizures of Property and Communications

"The United States is not liable under § 1346(b) for constitutional tort claims."  *Webb v. Desan*, 250 F. App'x 468, 471 (3d Cir. 2007).  The FTCA does not waive immunity for constitutional torts against the government, "in part because a private person would not be subject to liability under the federal constitution."  4 Fed. Prac. & Proc. Juris. § 3658.2.  The Third Circuit has explained that a defendant's "constitutional tort claims against the United States fail as a matter of law" since "[s]tate law provides the source of substantive liability under the FTCA…[but] federal law is the source of liability for the deprivation of a federal

constitutional right." *Webb*, 250 F. App'x at 471. The moving brief seeks dismissal of Rasmussen's wrongful search and seizure claim on the foregoing well established law, and he has not opposed. The claim is dismissed.

### V.   CONCLUSION

As discussed above, it appears that Rasmussen has filed this lawsuit under the FTCA based upon his assertions that he was falsely accused of certain activities in a sworn complaint that was presented to a neutral magistrate who issued an arrest warrant. The "falsity" is pleaded on the basis that Rasmussen insists certain facts the FBI agent asserted about him in the sworn complaint are not true. The Court has carefully reviewed the sworn complaint and determined that specific conduct is attributed to Rasmussen in the form of emails that compellingly demonstrate probable cause that a crime under the wire fraud statute was committed by Rasmussen and others. Under New Jersey law a finding of probable cause decimates most of the intentional torts enumerated in the FTCA that are raised here. Consequently that Court grants the motion of the United States to dismiss Rasmussen's claims of false arrest, malicious prosecution, false imprisonment, and intentional infliction of emotional distress brought under the FTCA for failure to state a claim upon which relief can be granted. Rasmussen's claim for unconstitutional search and seizure violations is dismissed because the FTCA does not waive sovereign immunity for constitutional claims.

The Court notes that Rasmussen has requested leave to amend his complaint in order to supplement with facts sufficient to overcome any deficiencies the Court may find with respect to his claims of false arrest, malicious prosecution, and intentional infliction of emotional distress. Leave to amend is not automatic. Rasmussen may move to amend consistent with the direction in the order filed herein.

Date: December 30, 2015

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.